# ANALYTIC RESOURCES, LLC

*Economic and*
*Financial Analysis*

*Policy Evaluation*

*Statistical Analysis*

*Litigation Support*

*Expert Testimony*

■

*8 Lunar Drive*
*P.O. Box 4021*
*Woodbridge, CT 06525*
*Tel: (203) 397-8935*
*Fax: (203) 397-8949*
*Email:*
*nfo@analyticresources.com*

■

*www.analyticresources.com*

## SUPPLEMENTAL REPORT ON DAMAGES TO MERRY CHARTERS, LLC AND CARL SHILLO AS A RESULT OF DISCONTINUATION OF OPERATIONS IN STONINGTON, CONNECTICUT

This supplemental report consists of the valuation of cash flows lost to Merry Charters, LLC and Carl Shillo as a result of having to discontinue the use of a commercial dock along the Mystic River in Stonington, Connecticut. The valuations in this report are current as of January 23, 2004. If there is a significant lapse of time before trial, it may be necessary to update this report at the time of trial. In addition, as additional information becomes available, it will be necessary to update this report.

In order to prepare this report, the following documents were reviewed:

- Second Amended Complaint in Merry Charters, LLC and Carl Shillo, Plaintiffs vs. Town of Stonington, et. al., Defendants, United States District Court of Connecticut, Civil Action No. 3:02CV336(MRK), September 17, 2003;
- Plaintiff's Responses To Defendants' Second Set of Interrogatories and Requests For Production in Merry Charters, LLC and Carl Shillo, Plaintiffs vs. Town of Stonington, et. al., Defendants, United States District Court of Connecticut, Civil Action No. 3:02CV336(SRU), September 26, 2003;
- Carl and Marie Shillo's federal income tax returns for the years 1999 through 2002;
- September 23, 2003 correspondence from Carl Shillo (including accompanying invoices) concerning his health insurance premiums;
- Merry Charters, LLC monthly checking account statements for the period ending January 31, 2001 through the period ending July 31, 2002;
- Copies of Merry Charters, LLC ledgers;
- 2000 and 2001 calendar diaries maintained by Carl Shillo;
- Merry Charters and Harbor Cruises diaries;
- Closing documents for a $133,000 commercial loan from the Savings Bank of Manchester to Merry Charters, LLC;
- Records of various checks issued by Merry Charters, LLC;
- Documents from Savings Bank of Manchester related to the refinancing of the mortgage of Carl Shillo's residence at 336 Hebron Road, Andover, Connecticut;
- Merry Charters, LLC Sales and Use Tax Return for the year ending December 31, 2001;
- Merry Charters, LLC Business Entity Tax Returns for the year ending December 31, 2002;
- Merry Charters, LLC Sales and Use Tax Permit issued March 27, 2002;
- Proposal submitted in November 2000 by Merry Charters, LLC to the City of New London, Connecticut to operate a tour boat program in the New London Harbor;

- Proposal submitted on July 24, 1999 by Merry Charters, LLC to J. Revell Carr, President and Director, Mystic Seaport Museum, Inc. to establish an on the water educational program;
- Proposal submitted on February 5, 2001 by Merry Charters, LLC to the Town of Coventry, Connecticut to establish a tour boat service at Coventry Lake;
- March 28, 2001 correspondence Carl Shillo to Mark Provost, Mohegan Sun;
- Various promotional materials and brochures prepared by Merry Charters, LLC;
- Defendants' Disclosure of Expert Witness: John H. Kramer, ASA, CPA, CFE in Merry Charters, LLC and Carl Shillo, Plaintiffs vs. Town of Stonington, et. al., Defendants, United States District Court of Connecticut, Civil Action No. 3:02CV336(SRU), September 26, 2003;
- Correspondence from Christian Belland to Carl Shillo dated December 15, 2003;
- March 13, 2001 correspondence from Stephen Sabo, Director, Bus Sales, Mohegan Sun to the Stonington Planning and Zoning Commission;
- October 15, 2000 correspondence from Therese Thesier, Owner/Operator, Mystic & Shoreline Visitor Information Center, Olde Mistick Village to the Stonington Planning and Zoning Commission; and
- List of bus companies register with Mohegan Sun.

Carl Shillo was interviewed in order to prepare this report. Secondary data sources were also utilized in the preparation of this report.

### Background

Merry Charters, LLC was a limited liability company that operated a tour boat known as the "Mystic Belle" from a commercial dock along the Mystic River in Stonington, Connecticut. Merry Charters was owned and operated by Carl Shillo, the Captain of the boat. Beginning on approximately June 12, 2000 (after the start of the normal tourist season in the area), Merry Charters began receiving income from the operation of the tour boat in Mystic Harbor. Merry Charters operated river cruises along the Mystic River. Merry Charters also operated a combined river cruise and clambake, in conjunction with Mystic Seaport, and casino group packages with the Mohegan Sun Casino. On July 27, 2000, Merry Charters received a Notice of Violation from the Zoning Enforcement Officer for the Town of Stonington as a result of alleged inadequate parking. Merry Charters applied for a special permit to operate at the commercial dock and the application was denied by the Stonington Planning and Zoning Commission on October 17, 2000. Merry Charters attempted to secure adequate off-street parking that would accommodate its tour boat operation. Merry Charters again applied to the Stonington Planning and Zoning Commission for a special permit that would allow it to operate its tour boat operation from the commercial dock in Stonington and the application was denied by the Commission on May 15, 2001.

Although Merry Charters was able to continue operating at the commercial dock in Stonington through the remainder of 2000, it was unable to operate from that location, beginning in 2001. Merry Charters attempted to operate from other sites, including the City of New London, Town of Coventry, and Mystic Seaport, but was unable to secure these sites. Merry Charters finally set up operations in Norwich, Connecticut, but as a result of the change in location, Merry Charters lost its "tie-ins" with the Mohegan Sun Casino and Mystic Seaport. As

a result of revenues dropping from $72,901 in 2000 to $17,783 in 2001 and increased losses, Mr. Shillo was forced to close Merry Charters.[1]  Since closing Merry Charters, Mr. Shillo has not found alternative employment and it has not been possible for him to open another business.

### Lost Cash Flows

Annual lost cash flows are projected from 2001 until Mr. Shillo reaches age 63.1.[2]  Lost cash flows are defined as incremental revenues less incremental cash expenses.

As discussed above, Merry Charters had sales of $72,901 in 2000 that resulted from its tour boat operation from June 12, 2000 through October 31, 2000.  In 2000, Merry Charters had gotten off to a late start as it prepared a recently obtained boat for operations during the 2000 summer season.  Merry Charter's normal annual revenues are best represented by the revenue stream that results from operations during a full 2000 summer season from May 1, 2000 through October 31, 2000.  In order to extrapolate Merry Charter's 2000 revenues for a full season, it is necessary to project revenues for May 2000, as well as revenues for all of June 2000.  Merry Charter's revenues equaled $27,027.94 in July and August 2000, and the $26,234.94 in average monthly revenues for July and August 2000 is used as the projected revenue base for the full month of June 2000.[3]  Merry Charter's revenues equaled $7,375.02 in September 2000 and $3,780.47 in October 2000, and the $5,577.75 average monthly revenues for September and October 2000 is used as the projected revenue base for May 2000.[4]  After projecting Merry Charter's revenues for May and June 2000, extrapolated revenues for a full season in 2000 equal $95,444.06.

According to Mr. Shillo, 40 percent of Merry Charter's revenues in 2000 resulted from a customer sharing arrangement between Merry Charters, Mohegan Sun and Mystic Seaport.  Under the customer sharing arrangement, visitors would arrive on tour buses that were operated by companies registered with Mohegan Sun.  These customers would visit attractions at Mystic Seaport and would take a ride on the Merry Charter.  The program was marketed by Mohegan Sun's bus sales department.[5]  According to Mr. Shillo, the remaining 60 percent of Merry Charter's revenues in 2000 resulted from "walk-up traffic".  Revenues from the customer sharing arrangement and walk-up traffic are projected separately.

The projected annual growth in Merry Charter's revenues from the customer sharing arrangement with Mohegan Sun equals 6.0 percent in 2001 and 30.0 percent in 2002.[6]

---

[1] The revenues are those reported on the Schedule C that is included with Mr. Shillo's federal tax returns for 2000 and 2001.

[2] Based upon the projected worklife of a typical 52 year old man (Mr. Shillo's age at the end of calendar year 2001) as reported in Gary R. Skoog and James E. Ciecka, "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation and Probability Intervals", *Journal of Legal Economics*, Spring/Summer 2001.

[3] Monthly revenues were computed from ledgers maintained by Carl Shillo and match the monthly revenues shown in Exhibit A of John H. Kramer's rebuttal report that is included in Defendants' Disclosure of Expert Witness.

[4] Ibid.

[5] The customer sharing program is described in the March 31, 2001 correspondence to the Stonington Planning and Zoning Commission from Stephen Sabo, Director, Bus Sales, Mohegan Sun.

[6] The annual growth rates for revenues in 2001 and 2002 are equal to the Fiscal Year 2001 and Fiscal Year 2002 year-over-year percent change in Mohegan Sun's revenues, as reported in the 2002 Mohegan Sun Annual Report.

4

Beginning in 2003 and continuing through the Mr. Shillo's projected remaining worklife, projected revenue growth from the customer sharing arrangement is equal to an annual average 8.2 percent.[7]

The projected growth in Merry Charter's revenues from walk-up traffic equals 1.6 percent in 2001.[8] Beginning in 2002 and continuing through Mr. Shillo's projected remaining worklife, projected revenue growth from walk-up traffic equals 7.3 percent per year.[9]

Merry Charters also benefited from advertising that was done by Mohegan Sun at no charge to Merry Charters in order to promote the customer sharing arrangement. According to Mr. Shillo, he was informed by Mohegan Sun that $12,000 was spent on such advertising in 2000 and an additional $15,000 in 2001. This is of value to Merry Charters, even though it is not reflected in reported revenues. If Merry Charters had continued to operate after 2001, it is assumed that as long as Merry Charters maintained its relationship with Mohegan Sun, there would be a continued benefit from what is in effect free advertising. For 2002, this advertising is valued by increasing the 2001 advertising expenditures by 1.5 percent.[10] Beginning in 2003 and continuing through the remainder of Mr. Shillo's projected worklife, the advertising expenditures are increased by 3.3 percent per year to reflect the benefit provided by Mohegan Sun.[11]

Costs are divided into the following categories: direct costs, interest expense and other costs. Direct costs, which are obtained from the Schedule C filed with Mr. Shillo's 2000 tax return, include cost of goods sold, office expense, repairs and maintenance, supplies, captaining, outside services and telephone. In 2000, direct costs totaled $55,578, or 76.2 percent of the $72,901 in revenues. In order to project direct costs beginning in 2001, it was assumed that direct costs would continue to be 76.2 percent of revenues.

Mr. Shillo was paying interest expense, as a result of obtaining a ten year commercial loan in the amount of $133,000 from Savings Bank of Manchester to finance the purchase of a boat. The loan was closed on April 6, 2000 with interest payable at a 9.50 percent rate and principal in the amount of $2,216.67 paid in the months of June through November over the life of the loan. At the end of five years, the interest rate on the loan was scheduled to be reset at the bank's then prevailing five-year rate for commercial loans.[12]

When Savings Bank of Manchester issued an approval letter for the loan on February 24, 2003, the yield on five-year U.S. Treasury instruments was 6.56 percent, which is 2.94 percent

---

[7] This equals the average annual change in Connecticut's gross state product for hotels and lodging from 1979 to 2001. Annual estimates of Connecticut's gross state product for hotels and lodging were obtained from U.S. Department of Commerce, Bureau of Economic Analysis, http://www.bea.gov/bea/regional/gsp/.

[8] This is equal to the actual annual change in gross state product for the New England states in 2001, as reported at Department of Commerce, Bureau of Economic Analysis, http://www.bea.gov/bea/regional/gsp/.

[9] This is equal average annual percent change in gross state product for the New England states from 1979 to 2001, as reported at Department of Commerce, Bureau of Economic Analysis, http://www.bea.gov/bea/regional/gsp/.

[10] This equals the actual year-over-year percent change in the Gross Domestic Product Implicit Price Deflator, as reported at U.S. Department of Commerce, http://www.bea.gov/bea/dn/nipaweb/.

[11] This equals the average year-over-year percent change in the Gross Domestic Product Implicit Price Deflator for the years 1979 through 2002, as reported at U.S. Department of Commerce, http://www.bea.gov/bea/dn/nipaweb/.

[12] Information on the loan is based upon closing documents for the loan.

below the 9.50 percent interest rate on the loan.[13]  In order to project the interest rate on the loan at the end of five years, the 2.94 percent difference was added to the average 7.77 percent rate on five year U.S. Treasury instruments over the 1979 to 2003 period.[14]  Based on the current interest rate and projected future interest rate on the loan, the interest expense was projected over the life of the loan.

Other costs include advertising, insurance, taxes and licenses, printing, bank charges, and dockage, as reported on the Schedule C included with Mr. Shillo's tax return in 2000.  These costs totaled $17,098 in 2000.  Since advertising costs that are reported on the 2000 Schedule C included a one-time $3,889 expenditure for monogrammed tee shirts, some of which were sold in 2000 with the remainder to be sold in the future, this expense is deducted from other costs in 2000 for projection purposes.[15]  In order to project other costs beginning in 2001, these costs were projected to increase by 2.4 percent in 2001 and by 1.5 percent in 2002.[16]  Beginning in 2003, the projected average annual increase in other costs equals 3.3 percent.[17]

In order to compute past losses, actual negative cash flow equal to $23,995 in 2001 was subtracted from Mr. Shillo's projected cash flow in 2001.  The $23,995 cash flow was obtained by adding $22,565 in depreciation and $4,374 in amortization, which are non cash expenditures, to Mr. Shillo's $50,384 net loss in 2001.[18]  In order to value Mr. Shillo's past losses, interest was accrued at 9.50 percent, the interest rate on his business loan from 2000 to the present.  As shown in Exhibit 1 on page 6, the value of Mr. Shillo's lost cash flows from 2001 through 2003 equals $75,538.

As part of Mr. Shillo's future losses, a terminal value in 2012 is computed as an additional cash flow in 2012.  Although Mr. Shillo's projected worklife is through age 63.1, there is still additional lost value as Mr. Shillo could exit the business by selling it to another party.  In order to establish a value for Mr. Shillo's business in 2012, the projected $196,045 in revenues from the Mohegan Sun customer sharing arrangement and walk-in traffic, which are for only a portion of the year, are extrapolated to $245,898 for a full calendar year.  Based upon all

---

[13] Data on five year U.S. Treasury instruments was obtained from Board of Governors of the Federal Reserve, http://www.federalreserve.gov/h15.
[14] Ibid.
[15] Per discussion with Carl Shillo.
[16] Based upon the actual change in the GDP implicit price deflator for those years, which was obtained from U.S. Department of Commerce, http://www.bea.gov/bea/dn/nipaweb/.
[17] Equals the average annual percent increase in the GDP implicit price deflator from 1979 through 2002.  The GDP implicit price deflator data was obtained from U.S. Department of Commerce, http://www.bea.gov/bea/dn/nipaweb/.
[18] These figures were obtained from the Schedule C that was part of Mr. Shillo's 2001 income tax return.

6

**Exhibit 1.** **Lost Net Cash Flows from 2001 through 2003**

| | 2001 | 2002 | 2003 | Total |
|---|---|---|---|---|
| Revenues From Customer Sharing With Mohegan Sun | $ 45,527 | $ 59,185 | $ 64,038 | $ 65,260 |
| Revenue from "Walk-Up Traffic" | 53,330 | 57,221 | 61,397 | |
| Advertising and Promotion By Mohegan Sun | | 15,230 | 15,729 | |
| Less Direct Costs | 75,366 | 88,745 | 95,629 | |
| Less Interest | 11,003 | 9,739 | 8,476 | |
| Less Other Costs | 13,523 | 13,731 | 14,180 | |
| Less Actual Negative Cash Flow | ( 23,995) | | | |
| Net Lost Cash Flows | 22,960 | 19,421 | 22,879 | |
| Accrued Interest | | | | 10,278 |
| Value of Net Cash Flows | | | | 75,538 |

transactions from the BIZCOMPS database of business sales from January 1992 through January 2003, the average selling price for a business in Standard Industrial Classification 7999, amusement and recreation services not elsewhere classified, was 0.6486 times revenue. Based upon Merry Charter's annualized revenues of $245,898 as a going concern in 2012, the value of Merry Charters equals 0.6486 times $245,898 or $159,490 in 2012.

In order to discount future cash flows to present value, it is necessary to use a risk adjusted discount rate. The risk adjusted discount rate used is 23.08 percent and its computation is shown in Exhibit 2 on page 8 of this report.

Exhibit 3 on page 9 displays the present value of Mr. Shillo's future lost cash flows on the basis of a terminal value that is based upon revenues for 2012. As shown in Exhibit 3, the value of Mr. Shillo's future cash flows equals $190,358.

An alternative projection of future cash flows was done in which the 2012 terminal value was based upon 2012 net cash flow. Merry Charter's cash flow (all of Merry Charter's revenues plus Mohegan Sun advertising expenditures less all costs) was equal to $48,235 for the portion of the year in which it would have operated. Based upon all transactions from the BIZCOMPS database of business sales from January 1992 through January 2003, the average selling price for a business in Standard Industrial Classification 7999, amusement and recreation services not elsewhere classified, was 1.9757 times sellers discretionary earnings. Based upon Merry Charter's extrapolated annualized net cash flow of $60,501 as a going concern in 2012, the value of Merry Charters equals 1.9757 times $60,501 or $119,532 in 2012. As shown in Exhibit 4 on page 10, the value of Mr. Shillo's future cash flows equals $182,427 when cash flows are used to determine the terminal value in 2012.

Exhibit 5 on page 11 displays the total value of past and future cash flows under alternative calculations of terminal value in 2012. As shown in Exhibit 5, the value of both past and future lost cash flows ranges from $257,965 to $265,896.

### Loss of Use of Boat

Mr. Shillo sold the boat used by Merry Charters for $135,000 in June 2002. Mr. Shillo was forced to sell the boat at that time in order to pay off extensive debt that he had incurred to establish and operate Merry Charters. Based upon an appraisal by Mark T. Perkins, Inc., which was included in a December 15, 2003 letter from Christian Belland to Carl Shillo, the boat had a replacement value of $400,000. The $265,000 difference between the appraised replacement value of the boat and what Mr. Shillo received when he sold the boat is also an element of damages.

### Summary

Damages, consisting of the sum of the value of Mr. Shillo's lost net cash flows and the loss of the use of the boat from his business, range from $522,965 to $530,896.

**Exhibit 2.** **Derivation of the Discount Rate Used to Value Future Lost Cash Flows**

| | |
|---|---|
| Current yield on 20-Year U.S. Treasury Instruments[1] | 4.97 percent |
| Plus equity risk premium[2] | 7.00 percent |
| Plus firm size premium for micro-capitalization stocks[2] | 3.53 percent |
| Plus industry premium for firms in SIC Code 799, other amusement services[2] | -  2.42 percent |
| Plus adjustment for privately held firms | 10.00 percent |
| **Equals discount rate** | **23.08 percent** |

**Sources**: [1] Board of Governors of the Federal Reserve, http://www.federalreserve.gov/h15.
[2]Ibbotson Associates, *Stocks, Bonds, Bills and Inflation: Valuation Edition, 2003 Yearbook.*

9

**Exhibit 3.  Lost Net Cash Flows from 2004 through 2012: Terminal Value Based Upon Valuing Revenues**

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues From Customer Sharing With Mohegan Sun | $ 69,289 | $ 74,971 | $ 81,118 | $ 87,770 | $ 94,967 | $ 102,755 | $ 111,181 | $ 120,297 | $ 103,773 | |
| Revenue from "Walk-Up Traffic" | 65,878 | 70,686 | 75,844 | 81,379 | 87,318 | 93,691 | 100,528 | 107,865 | 92,272 | |
| Advertising and Promotion By Mohegan Sun | 16,244 | 16,776 | 17,325 | 17,892 | 18,478 | 19,083 | 19,707 | 20,352 | 16,757 | |
| Less Direct Costs | 103,048 | 111,045 | 119,665 | 128,956 | 138,970 | 149,765 | 161,402 | 173,945 | 149,460 | |
| Less Interest | 7,212 | 6,440 | 5,284 | 3,859 | 2,434 | 1,009 | | | | |
| Less Other Costs | 14,644 | 15,124 | 15,619 | 16,130 | 16,658 | 17,203 | 17,767 | 18,348 | 15,107 | |
| Plus Terminal Value | | | | | | | | | 159,490 | |
| Net Lost Cash Flows | 26,507 | 29,824 | 33,719 | 38,096 | 42,701 | 47,552 | 52,247 | 56,221 | 207,725 | $ 534,592 |
| Present Value of Net Lost Cash Flows @ 23.08% | | | | | | | | | | 190,358 |

10

## Exhibit 4. Lost Net Cash Flows from 2004 through 2012: Terminal Value Based Upon Valuing Net Cash Flow

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues From Customer Sharing With Mohegan Sun | $ 69,289 | $ 74,971 | $ 81,118 | $ 87,770 | $ 94,967 | $ 102,755 | $ 111,181 | $ 120,297 | $ 103,773 | |
| Revenue from "Walk-Up Traffic" | 65,878 | 70,686 | 75,844 | 81,379 | 87,318 | 93,691 | 100,528 | 107,865 | 92,272 | |
| Advertising and Promotion By Mohegan Sun | 16,244 | 16,776 | 17,325 | 17,892 | 18,478 | 19,083 | 19,707 | 20,352 | 16,757 | |
| Less Direct Costs | 103,048 | 111,045 | 119,665 | 128,956 | 138,970 | 149,765 | 161,402 | 173,945 | 149,460 | |
| Less Interest | 7,212 | 6,440 | 5,284 | 3,859 | 2,434 | 1,009 | | | | |
| Less Other Costs | 14,644 | 15,124 | 15,619 | 16,130 | 16,658 | 17,203 | 17,767 | 18,348 | 15,107 | |
| Plus Terminal Value | | | | | | | | | 119,532 | |
| Net Lost Cash Flows | 26,507 | 29,824 | 33,719 | 38,096 | 42,701 | 47,552 | 52,247 | 56,221 | 167,767 | $ 494,634 |
| Present Value of Net Lost Cash Flows @ 23.08% | | | | | | | | | | 182,427 |

<u>Exhibit 5.</u>  Summary of the Total Value of Net Lost Cash Flows

|  | <u>2012 Terminal Value Based Upon Revenues</u> | <u>2012 Terminal Value Based Upon Net Cash Flow</u> |
|---|---|---|
| Value of cash flows from 2001 through 2003 | $ 75,538 | $ 75,538 |
| Value of cash flows from 2004 through 2012 | 190,358 | 182,427 |
| Value of total cash flows | **265,896** | **257,965** |